# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 6, 2014        Decided August 26, 2014

No. 12-5383

SIERRA CLUB, ET AL.,
APPELLANTS

v.

SALLY JEWELL, IN HER OFFICIAL CAPACITY AS SECRETARY OF
THE U.S. DEPARTMENT OF INTERIOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01513)

———

*Daniel P. Selmi* argued the cause for appellants. With him on the briefs were *Aaron S. Isherwood*, *Peter M. Morgan*, *Andrea C. Ferster*, and *Elizabeth S. Merritt*. *Paul W. Edmondson* entered an appearance.

*Judith Rivlin* was on the brief for *amicus curiae* United Mine Workers of America in support of appellants. *Arthur Traynor III* entered an appearance.

*Katherine J. Barton*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Robert G. Dreher*, Acting Assistant Attorney General,

and *David C. Shilton*, Attorney. *Andrew C. Mergen*, Attorney, U.S. Department of Justice, entered an appearance.

*Robert G. McLusky*, *Blair M. Gardner*, and *Michael J. Schrier* were on the brief for *amicus curiae* West Virginia Coal Association, Inc. in support of appellees.

Before: GARLAND, *Chief Judge*, SRINIVASAN, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

Dissenting opinion filed by *Senior Circuit Judge* SENTELLE.

SRINIVASAN, *Circuit Judge*:   The Battle of Blair Mountain is the largest armed labor conflict in our nation's history.  In late August 1921, after years of tension between coal miners and coal companies, more than 5,000 West Virginia coal miners began a march to Logan and Mingo Counties, West Virginia.  They aimed to unionize and liberate fellow miners living under martial law.  When they reached Blair Mountain, a 1,600-acre area in Logan County, they encountered roughly 3,000 armed men.  Those men, mostly hired by coal companies, manned a ten-mile defensive line across Spruce Fork Ridge, including Blair Mountain.  They dug trenches, mounted machine guns, and dropped homemade bombs.  The miners responded with gunfire of their own.  The Battle endured for several days, causing numerous casualties. President Harding sent federal troops to quell the fighting, and the coal miners surrendered.

Recently, various environmental and historical preservation organizations, recognizing Blair Mountain Battlefield's historical significance, have sought to gain

protection for the Battlefield from surface coal mining. This case arises from their efforts to obtain the Battlefield's listing in the National Register of Historic Places. After several unsuccessful nominations for its inclusion in the Register, the Battlefield gained listing in 2009. Its stay in the Register was short-lived. Within days, the Keeper of the Register removed the Battlefield upon determining that the wishes of area property owners had not been accurately captured in the nomination process. The organizations then brought an action in federal court challenging the Battlefield's removal from the Register. The district court granted summary judgment against them, holding that they lack standing because they fail to demonstrate the requisite injury, causation, or redressability. We disagree and conclude that they have standing to challenge the Keeper's decision.

I.

On January 13, 2009, the Deputy West Virginia State Historic Preservation Officer (SHPO) nominated the Battlefield to the Keeper of the National Register of Historic Places for inclusion in the Register. Under both federal and state law, listing of a place in the Register triggers establishment of certain protections, including minimization of adverse impacts from surface mining. *See* 30 C.F.R. § 780.31(a); W. Va. Code R. § 38-2-3.17.c. For a site to be listed in the Register, a majority of property owners in the area must not object. *See* 16 U.S.C. § 470a(a)(6); 36 C.F.R. § 60.6(g). If a majority object, the site cannot gain listing. *See* 16 U.S.C. § 470a(a)(6); 36 C.F.R. § 60.6(n), (s). For the January 2009 nomination of the Battlefield, the SHPO initially determined that a majority of property owners did not object to inclusion of the Battlefield in the Register. Following that determination, on March 30, 2009, the Keeper listed the Battlefield in the Register.

One week later, the SHPO notified the Keeper that he had failed to account for a number of objections to the listing, which he had received from a law firm representing several coal companies. When the SHPO took into consideration the additional objections, he found that a majority of landowners objected to the Battlefield's inclusion in the Register. The SHPO therefore asked the Keeper to remove the Battlefield from the Register. After soliciting and considering comments, the Keeper delisted the Battlefield, agreeing that there had been prejudicial procedural error in the listing process. *See* 36 C.F.R. § 60.15(a)(4).

The Sierra Club, the Ohio Valley Environmental Coalition, and other organizations (collectively, the Coalition) filed an action in federal district court against the Keeper, the Secretary of the Interior, and the Director of the National Park Service (collectively, the Interior). The Coalition claimed that the Keeper's decision to delist the Battlefield was arbitrary and capricious, and sought vacatur of the decision and relisting of the Battlefield as of March 30, 2009. The district court granted summary judgment to the Interior, holding that the Coalition failed to establish standing to bring the action. *Sierra Club v. Salazar*, 894 F. Supp. 2d 97, 114 (D.D.C. 2012).

According to the district court, the Coalition could not demonstrate any of the three components of standing: injury in fact, causation, or redressability. With regard to injury in fact, the court held that the Coalition failed to show that any injury was "actual or imminent." *Id.* at 110 (internal quotation marks omitted). Even though "a considerable amount of the Battlefield is . . . currently subject to surface mining permits," there was no actual or imminent injury because the coal companies had yet to mine the Battlefield under the permits. *Id.* at 110. The court viewed any claim of

future mining to be "purely conjectural," reasoning that certain permits had been in existence for years with no mining on the Battlefield. *Id.* at 112. The Coalition also could not satisfy causation because its concerns depended on "speculative predictions about the actions of third parties, the coal mining companies." *Id.* at 113. Turning to redressability, the court acknowledged that federal and West Virginia mining law generally prohibited surface mining on property listed in the Register. *Id.* at 114 (citing 30 U.S.C. § 1272(e)(3)). Those prohibitions, however, contained an exemption for permits with valid existing rights. *Id.* According to the district court, the coal companies likely had valid existing rights because the permits had been "acquired prior to the historic district's inclusion on the National Register." *Id.* Therefore, the court held, "surface mining would be permitted on the Blair Mountain Battlefield" even if the Keeper relisted the Battlefield. *Id.*

The Coalition now appeals. We review the district court's decision on standing de novo. *See In re Endangered Species Act Section 4 Deadline Litig.*, 704 F.3d 972, 976 (D.C. Cir. 2013).

II.

To establish standing to sue for purposes of Article III of the Constitution, the Coalition must show: (1) "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). At summary judgment, "the

plaintiff . . . must 'set forth' . . . 'specific facts'" supporting standing. *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)). We conclude that the Coalition has adequately demonstrated injury in fact, causation, and redressability.

A.

To demonstrate injury in fact, the Coalition must show that the asserted injury to its members is concrete and particularized, and is also actual or imminent. The Coalition makes both of those showings.

1.

The Supreme Court has recognized that harm to "the mere esthetic interests of the plaintiff . . . will suffice" to establish a concrete and particularized injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). In *Lujan*, for instance, the Court explained that, "[o]f course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." 504 U.S. at 562-63. This court has similarly understood that "injury in fact can be found when a defendant adversely affects a plaintiff's enjoyment of flora or fauna." *Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 337 (D.C. Cir. 2003). We explained that a person "may derive great pleasure from visiting a certain river; the pleasure may be described as an emotional attachment stemming from the river's pristine beauty." *Id.* at 337-38 (citing *Laidlaw*, 528 U.S. at 182-83); *see Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 431 (D.C. Cir. 1998) (en banc) (relying on "aesthetic interest in observing animals living under humane conditions").

Here, similarly, Coalition members who view and enjoy the Battlefield's aesthetic features, or who observe it for purposes of studying and appreciating its history, would suffer a concrete and particularized injury from the conduct of surface mining on the Battlefield. Two individuals each explained that "[s]urface mining at Blair Mountain would directly and indirectly harm my ability to use, enjoy, and appreciate the historic Battlefield and its landscape." Rasmussen Decl. ¶ 10; Ziehl Decl. ¶ 10. Members also expressed an interest in preserving the "beautiful mountain landscape," observing that their "ability to visit and enjoy the . . . surrounding areas would be adversely impacted by keeping Blair Mountain Battlefield off of the National Register of Historic Places." Hendrix Decl. ¶ 14; *see also* Simmons Decl. ¶ 9. Other individuals visit and study the Battlefield for educational purposes. *See* Rasmussen Decl. ¶¶ 2-6. And one person, whose grandfather fought at the Battle of Blair Mountain and who plans to continue visiting the site, stated that mining of the Battlefield would "destroy a virtually holy place" that he considers "sacred ground." Martin Decl. ¶ 11. Those Coalition members possess concrete interests in appreciating and studying the aesthetic features and historical significance of a preserved and intact Battlefield. Their interests would be injured if the Battlefield were mined.

Amicus West Virginia Coal Association argues that the Coalition cannot demonstrate injury in fact because the individuals whose interests would be injured by mining of the Battlefield own no legal right to enter the Battlefield area. It is true that the Battlefield area is privately owned (with the majority of property owned by members of the Coal Association). It is also true that the Coalition puts forward no evidence that its members—although apparently having frequently entered the Battlefield area in the past—possess

any legal entitlement to set foot on the privately owned property. But even assuming those individuals no longer possess any ability to enter the Battlefield site itself, there would be no need for them to commit a trespass in order to experience a cognizable injury. They possess interests in observing the landscape from surrounding areas, for instance, or in enjoying the Battlefield while on public roads. *See* Martin Decl. ¶ 9 ("At least four times I have visited a friend across the highway from Blair Mountain . . . and have driven across Blair [M]ountain twenty times or more."). Their cognizable interests thus do not depend on any legal right to make a physical entry onto the Battlefield. And while the Supreme Court in *Lujan* spoke in terms of a "legally protected interest," 504 U.S. at 560, this court has specifically recognized that, when the *Lujan* "Court used the phrase 'legally protected interest' as an element of injury-in-fact, it . . . was referring only to a cognizable interest." *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007) *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008) (internal quotation marks omitted). *Lujan* therefore "concluded that plaintiffs had a cognizable interest in observing animal species without considering whether the plaintiffs had a legal *right* to do so." *Id.* (internal quotation marks omitted). Accordingly, there is no reason that the cognizability of aesthetic and associated interests in a particular site could turn on owning a legal right to enter or view the property.

This court's decision in *National Wildlife Federation v. Hodel*, 839 F.2d 694 (D.C. Cir. 1988), is illustrative. *National Wildlife* involved a multitude of challenges to regulations promulgated under the Surface Mining Control and Reclamation Act. One regulation expanded a variance from a statutory requirement generally obligating mining companies to return mined land to its approximate original

contours. *Id.* at 714-15. In holding that the plaintiffs had established standing to challenge the expanded variance, the court referenced only one individual's affidavit. And the court pointed specifically (and exclusively) to a portion of her affidavit "expressing concern over 'granting [of] any variances to allow leaving highwalls on non-steep slopes' on land near her home because '[s]uch a variance would adversely impact my enjoyment of the natural vistas of these hills.'" *Id.* at 715 (quoting affidavit) (alterations in original). The court thus relied solely on impairment of the affiant's ability to enjoy the "natural vistas" of the nearby hills from her own home, regardless of the absence (or existence) of any legal right on her part to view or make an entry onto the nearby hills. *Id.*; *see also Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1031 (D.C. Cir. 2008) (per curiam) ("Petitioners have standing, for members of these organizations engage in recreational birdwatching and research on birds in the Gulf Coast region."). As another court of appeals has explained, "[i]f an area can be observed and enjoyed from adjacent land, plaintiffs need not physically enter the affected area to establish an injury in fact." *Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir. 2001). That understanding governs here.

2.

The Coalition also satisfies its burden to show that its members' injuries are actual or imminent. Because there is no allegation that any mining has already occurred in the Battlefield, we deal solely with the question whether the asserted injuries qualify as imminent. A plaintiff must show a "substantial probability of injury" to establish imminent injury. *Chamber of Commerce of the U.S. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011) (alterations and internal quotation marks omitted); *see Clapper v. Amnesty Int'l USA*, 133 S. Ct.

1138, 1147-48, 1150 & n.5 (2013) (observing that injury must be "certainly impending" rather than "premised on a speculative chain of possibilities," and noting that "we have found standing based on a 'substantial risk' that the harm will occur").

The undisputed facts demonstrate the requisite "substantial probability" of injury here. First, coal companies have mined in the vicinity of the Battlefield under permits that encompass the Battlefield. *See S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1233 (10th Cir. 2010) (holding that environmental group's injury "results from [company's] ability to commence mining operations" due to possession of surface mining permit). The Coalition directs us to two active permits that encompass the Battlefield area: the "Camp Branch" permit and the "Bumbo No. 2" permit. The Camp Branch permit covers approximately 1,100 acres, including a portion of the Battlefield area. At the time of the complaint, the West Virginia Department of Environmental Protection—which is charged with issuing the permits—classified the Camp Branch permit as "active, moving coal," indicating that mining was proceeding under the permit. Additionally, one of the organizations in the Coalition prepared a report addressing the impact of surface mining at Blair Mountain; and that report stated, with regard to the Camp Branch permit, that "[m]ining is roughly 800-1200 meters away from the battlefield perimeter" and "is moving eastward toward the battlefield." The Interior has not disputed those conclusions in the report. Meanwhile, the Bumbo No. 2 permit spans over 1,500 acres, including 590 acres in the center of the Battlefield. The report of the Coalition organization found that mining under the Bumbo No. 2 permit has disturbed at least 300 acres near the Battlefield, and the Interior also has not disputed that conclusion.

In holding that the Coalition fails to establish imminent injury, the district court emphasized that the permits have existed for over ten years without any mining in the Battlefield to this point. *Sierra Club*, 894 F. Supp. 2d at 112. The coal companies themselves, however, assert an expectation that they would mine in the Battlefield under the permits. In apparent recognition of the significance of the Battlefield site to their mining interests, the companies did not act as disinterested bystanders in connection with the Battlefield's nomination for inclusion in the Register. Instead, in a letter objecting to the listing of the Battlefield in the Register, the coal companies—including the holders of the Camp Branch and Bumbo No. 2 permits—explained that they "own[] or lease[] minerals, particularly coal, *with the expectation of developing them in the nomination area*." Letter from Blair M. Gardner, Esq., Jackson Kelly PLLC, to Barbara Wyatt, Keeper (emphasis added). That statement of the companies' own expectations, coupled with their conduct of mining operations close to the Battlefield under permits encompassing the Battlefield itself, suffices to establish a substantial probability of mining in the Battlefield. The Coalition therefore adequately demonstrates that its injury is "actual or imminent, not conjectural or hypothetical." *Laidlaw*, 528 U.S. at 180.

## B.

The remaining prongs of standing consist of causation and redressability. The Coalition must show that its injury is "fairly traceable" to the delisting of the Battlefield, and that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 180-81. In this case, those inquiries are "two sides of a causation coin." *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997). Whether the asserted injuries

are fairly traceable to the Keeper's delisting of the Battlefield and whether the injuries are redressable both depend on the extent to which inclusion in the Register would afford the Battlefield protections from surface mining. We conclude that the Coalition meets the causation and redressability requirements.

The district court believed it likely under West Virginia law that surface mining would continue even if the Battlefield were relisted. According to the Coalition, however, even if surface mining could continue upon a relisting of the Battlefield, West Virginia law affords additional protections to places listed in the Register. The Coalition points to a regulation providing that "all adverse impacts [from surface mining] must be minimized" for sites included in the Register. W. Va. Code R. § 38-2-3-17.c. The Interior's principal response is that the Coalition forfeited that argument by failing to raise it in the district court. We disagree. In its briefing in the district court addressing the question of redressability, the Coalition argued that West Virginia mining law provided protections to places listed in the Register, specifically identifying and quoting from the same regulation on which it now relies. *See* Pls.' Summ. J. Opp'n & Reply at 6 (quoting W. Va. Code R. § 38-2-3-17.c). That was more than enough to preserve the argument for appeal.

On the merits of the issue, the Interior contends that § 38-2-3.17.c applies only to initial permit applications but not to the permit renewals that generally take place every five years. At the time of the initial applications for the Camp Branch and Bumbo No. 2 permits, the Battlefield had not been listed in the Register. Consequently, the Interior argues, the regulation could not affect mining operations under the Camp Branch and Bumbo No. 2 permits. We conclude, however, that for purposes of demonstrating causation and

redressability, there is an adequate possibility that the regulation would apply to renewals of those permits and not only to the initial applications.

Because "this court's jurisdiction turns on whether a proper interpretation of" West Virginia law "precludes the relief" the Coalition desires, the Coalition "need not convince this court that its interpretation is correct." *Ark Initiative v. Tidwell*, 749 F.3d 1071, 1076 (D.C. Cir. 2014). To satisfy redressability and causation, the Coalition's interpretation of the minimization requirement instead must be "non-frivolous." *Id.* (emphasis omitted) (quoting *United Transp. Union-Ill. Legislative Bd. v. STB*, 175 F.3d 163, 166 (D.C. Cir. 1999)); *see also Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1030 (D.C. Cir. 2003) ("[A] plaintiff's non-frivolous contention regarding the meaning of a statute must be taken as correct for purposes of standing.").

The Coalition's interpretation of West Virginia law meets that standard. Although the minimization requirement is not located in the "Permit Renewals" subsection of § 38-2-3, a permit cannot be renewed if the "terms and conditions of the existing permit are not being satisfactorily met." W. Va. Code § 22-3-19(a)(1)(A). And when certain terms and conditions "become applicable after the original date of permit issuance," the permittee has "a reasonable period to comply with such revised requirements." *Id.* According to the Coalition, the minimization requirement, which would take effect after the listing of the Battlefield in the Register, constitutes a "requirement[]" that would "become applicable after . . . permit issuance." The Interior's response rests on interpretations of federal mining regulations, which it contends impose a minimization requirement only at the time of permit application, not renewal. *See* 30 C.F.R. § 780.31.

Even if that interpretation of federal law is correct, however, it is not necessarily dispositive of West Virginia law, which could impose broader protections. *See* 30 C.F.R. § 730.11(a)-(b). We need not resolve the issue for purposes of assessing the Coalition's standing, but need only assess whether the Coalition's argument is non-frivolous. We conclude that it is.

The Interior also argues that the minimization requirement would afford no additional protections to the Battlefield over those already granted by West Virginia law. The Interior relies on § 38-2-3.17.d, under which the West Virginia Department of Environmental Protection "may require the [permit] applicant to protect historic . . . properties . . . through appropriate mitigation and treatment measures." W. Va. Code R. § 38-2-3.17.d. That provision applies both to places already listed in the Register and to places (like the Battlefield) eligible for future listing. *Id.* But even assuming that "appropriate mitigation and treatment measures" under that provision are no less protective than the requirement to "minimize" all "adverse impacts" under § 38-2-3.17.c, the former protections lie within the discretion of the Department: for sites eligible to be listed in the Register, the Department "may" elect to "require" mitigation and treatment measures, or "may" elect not to do so. W. Va. Code R. § 38-2-3.17.d. For sites already listed in the Register, by contrast, the obligation under § 38-2-3.17.c to minimize adverse impacts is expressed in mandatory terms. The Coalition's argument that § 38-2-3.17.c affords greater protections than otherwise arise under West Virginia law therefore is at least non-frivolous, and suffices to establish causation and redressability.

15

\*  \*  \*  \*  \*

We reverse the judgment of the district court and remand for further proceedings.

*So ordered.*

SENTELLE, *Senior Circuit Judge*, dissenting: I would affirm the grant of summary judgment by the district court.  I agree with that court that the federal courts have no jurisdiction over this action.  My reasoning is not precisely the same as the lower court.  This, of course, presents no problem, as we review a district court's grant of a "motion to dismiss for lack of standing" *de novo*. *Info. Handling Servs., Inc. v. Def. Automated Printed Servs., Inc.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003).

The majority opinion sets forth the facts and the history of this matter, and I have no reason to rehash the same here.  The majority also sets forth the requirements for standing:

> (1) "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

Maj. Op. at 5 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992))).  Again, I have no quarrel with the majority's recitation of the matters of principle, but I do conclude that its application of the first element is too broad.  As the Supreme Court has made plain, "the plaintiff must have suffered an 'injury in fact'—an invasion of a *legally protected* interest . . . ." *Lujan*, 504 U.S. at 560 (emphasis added).  The interest appellants asserted in this case was their interest in viewing the property of others.  I know of no legal protection for that interest, nor have either the appellants or the majority made me aware of any.

It is true, as the majority asserts, "that harm to 'the mere esthetic interest of the plaintiffs . . . will suffice' to establish a concrete and particularized injury."  Maj. Op. at 6 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009)).

However, this does not establish that the legally protected aesthetic interest of would-be plaintiffs encompasses the legally protected right to peer into the property of others.  It is true, as the majority states, that such cases as *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 431 (D.C. Cir. 1998) (en banc), and *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000), may support a generalization that "injury in fact can be found when a defendant adversely affects a plaintiff's enjoyment of flora or fauna," Maj. Op. at 6 (quoting *Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 337 (D.C. Cir. 2003)).  Nonetheless, none of these cases would lead me to suppose that my neighbor has a legally protected right that I have invaded when I trim the grass and behead the clovers, which he enjoys viewing.  As the majority recognizes, "the Coalition [appellants] puts forward no evidence that its members . . . possess any legal entitlement to set foot on the privately owned property."  Maj. Op. 8.  The majority fails to recognize that neither have they put forth any evidence of any legal entitlement to view that property.

As the Supreme Court has made clear, parties invoking federal jurisdiction bear the burden of establishing an "invasion of a *legally protected* interest."  *Lujan*, 504 U.S. at 560 (emphasis added).[1]  Appellants have offered nothing to establish

---

[1]Nothing in the majority's reliance on the reformulation of *Lujan*'s language in *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007), *aff'd in part sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008), convinces me to the contrary.  The transformation of "legally protected interests" to "cognizable interests" effected by the *Parker* court relies on *Claybrook v. Slater*, 111 F.3d 904 (D.C. Cir. 1997), which establishes that we need not explore the merits of a claim in order to determine the claimant's standing.  It remains the case that "if the plaintiff's claim has no

the invasion of any such interest.  The dismissal of this action should be affirmed.

_____

foundation in law, he has no legally protected interest and thus no standing to sue." *Claybrook*, 111 F.3d at 907.