NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0494n.06
No. 21-6053

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Dec 01, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| THOMAS NORTON, et al. | ) | |
|     Plaintiffs - Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| JOY BEASLEY, in her official capacity as Keeper of the National Register of Historic Places, et al. | ) | |
| | ) | OPINION |
|     Defendants - Appellees. | ) | |

Before: SUTTON, Chief Judge; BATCHELDER and DONALD, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge**. Thomas Norton and other interested property owners in Kentucky sued to have their real properties unlisted from the National Register of Historic Places. The district court rejected their challenges on the merits and granted summary judgment to the defendants. Because the district court lacked subject-matter jurisdiction, we VACATE the judgment of the district court and REMAND.

**I.**

Kentucky is home to the "Upper Reaches of Boone Creek Historic District"—a rural and agriculturally significant district of properties spanning approximately 10,000 acres of land in central Kentucky. When the district was nominated in 2008 to be listed in the National Register of Historic Places, a large number of property owners in the district objected. Others, though, either supported the nomination outright or were silent as to their preference. After a year-long

contest, the objecting property owners narrowly failed to reach the required majority vote, and the district was listed in the National Register.

Many perceived aspects of the nomination process, however, troubled the objecting property owners: the official count of objectors and property owners within the district repeatedly and suspiciously fluctuated, there was no mechanism in place for owners to stop the nomination process once it had begun, and—reminiscent of a dystopian novel—only the "Keeper" of the National Register knew when the tally of objectors and owners would end.[1]

For instance, the objecting property owners first presented what they claimed were 129 objections in September 2008.  By June 2009, they presented 103 objections, but only 91 of them were found valid under the regulatory criteria.  Over the course of the summer, the total number of property owners increased from 182 to 184, and the official count of objections fluctuated: down to 84, back up to 88, and eventually up to 90 by September 2009**.**  Additionally, the number of property owners fluctuated at least twice more, totaling 182 by November 2009.  In the objecting owners' views, no matter what they did, the nomination process could not be stopped, and they were left uncertain when the Keeper would finalize the objector count or determine the district's eligibility.

Seven years later, after litigating these and related issues in Kentucky state court, the objecting property owners filed a petition to "delist" the district due to "procedural irregularities" in the nomination process, as permitted under the relevant regulations.  The Keeper denied that request, and the objecting property owners brought this suit.  They allege that the procedural

---

[1] *See, e.g.*, Lois Lowry, *The Giver* (1993) (describing a world in which the "Receiver of Memory" is the sole keeper of societal memories).

deficiencies in the nomination and listing process requires the district's delisting and violated their constitutional due-process rights.

## A. National Register of Historic Places

The National Register of Historic Places was established by the National Historic Preservation Act of 1966 ("NHPA"), 54 U.S.C. § 300101, *et seq.* It comprises "districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture." *Id.* § 302101. The NHPA declares it a "national policy to preserve [these places] for public use." *Id.* § 320101.

Relevant here, under the NHPA, an historic property (or a district of historical properties) that meets certain requirements may be listed in the National Register and thus designated for protection and preservation. *Id.* § 302102; *see* §§ 300308, 300311, 300315(1); 36 C.F.R. § 60.4. To accomplish these ends, once a property is listed, or eligible to be listed, in the National Register, the NHPA requires any federal agency to "take into account the effect of" its "undertaking" on the "historic property." 54 U.S.C. § 306108; *see id.* § 300308. In this way, the National Register is considered an authoritative "planning tool" to help private citizens and federal, state, and local governments identify historic places that "should be considered for protection from destruction or impairment." 36 C.F.R. § 60.2; *see* 54 U.S.C. § 306108. But the mere listing of a private property in the National Register "does not prohibit under Federal law or regulation any actions which may otherwise be taken by the property owner with respect to the property." 36 C.F.R. § 60.2.

The Keeper of the National Register is responsible for maintaining the National Register and for determining whether properties are eligible to be listed in the National Register.[2] *Id.*

---

[2] The NHPA gives this responsibility to the Secretary of the Interior. 54 U.S.C. §§ 302101, 302105(c). But the Secretary has, through the National Park Service, delegated it to the Keeper. 36 C.F.R. § 60.3(f).

§ 60.3(f).  To do so, the Keeper works closely with its state counterparts, called State Historic Preservation Officers (an "SHPO").  54 U.S.C. § 302303.  Each SHPO must, among other things, identify and nominate eligible properties for listing in the National Register.  *Id.* § 302303(b)(2); *see* 36 C.F.R. § 60.6(a).  But before an SHPO officially nominates a property, it must first submit its proposed nomination to the State Review Board, a group of professionals such as historians, architects, and archeologists.  36 C.F.R. § 60.3(o); *id.* § 60.6(j).  The State Review Board evaluates the historic property (or district) and issues a recommendation on eligibility.  *Id.* § 60.3(o); *id.* § 60.6(j).  If a nomination is approved by the State Review Board, the SHPO will submit it to the Keeper.  *Id.* § 60.6(k).

Before submitting a nomination, the SHPO must also notify the affected property owners that their property is being considered for inclusion in the National Register. 54 U.S.C. §§ 302103(2)(F), 302105(a).  That way, the property owners have a "reasonable period of time" to "concur in, or object to, the nomination of the[ir] property." *Id.* § 302105(a).  That opportunity is essential to objecting property owners because if "a majority of the owners of privately owned properties" within the proposed district object to the listing, the district "shall not" be listed in the National Register "until the objection is withdrawn." *Id.* § 302105(b).

The NHPA's accompanying regulations provide more detail on these points.  For nominations concerning more than fifty property owners, the SHPO is not required to individually notify the owners in writing of its intent to nominate their properties.  36 C.F.R. § 60.6(c)–(d).  It may, instead, publish a notice in local newspapers at least 30 days prior to the State Review Board meeting.  *Id.*  The notice must provide property owners with the opportunity to submit written comments and object to the nomination in writing.  *Id.* § 60.6(d).  For counting purposes, "[e]ach owner of private property in a district has one vote regardless of how many properties or what part

4

of one property that party owns." *Id.* § 60.6(g). The SHPO is responsible for counting objections. *Id.* But even if a majority of owners do object, the SHPO nevertheless submits the nomination to the Keeper for the Keeper to determine whether the property is eligible for listing. *Id*. § 60.6(n); 54 U.S.C. § 302105(c).

Once a property is nominated to the Keeper, it will typically be included in the National Register within 45 days, unless the Keeper disapproves the nomination, an appeal is filed, or a majority of owners object to the listing. 54 U.S.C. § 302104(a); 36 C.F.R. § 60.6(r). After a property is listed in the National Register, a property owner may petition for its removal. 54 U.S.C. § 302104(d); 36 C.F.R. § 60.15(c). One of the four enumerated grounds for removal is a "[p]rejudicial procedural error in the nomination or listing process." 36 C.F.R. § 60.15(a)(4). If a property is removed on this ground, the property "shall be reconsidered for listing by the Keeper after correction of the error or errors" and "shall automatically be considered eligible for inclusion in the National Register without further action and will be published as such in the Federal Register." *Id.* Once a property is listed, neither the NHPA nor the regulations allow the Keeper to consider new objections, even when a removal petition is filed.

## B. Factual Background

*Nomination of the District*. The Clark County-Winchester Heritage Commission manages historic properties in Clark County, Kentucky, and assists the Kentucky Heritage Council (which serves as the Kentucky SHPO) with preparing nominations to the National Register. 2008, the Commission began drafting a nomination package for the Upper Reaches of Boone Creek Historic District (the "district"), a district located in Clark and Fayette Counties of Kentucky.

In July 2008, the SHPO sent individual notification letters to the affected property owners within the district. As required by the regulations, it solicited public comment and informed the

property owners that the district would not be listed "if a majority of the owners object." That next month, the SHPO held a public meeting to provide property owners with more information about the National Register. But after some property owners expressed their opposition at the meeting, the State Review Board tabled the nomination and asked the SHPO to resubmit the nomination after further public outreach.

Another month went by, and the SHPO sent a second round of notification letters to the property owners in the district, hoping that the State Review Board would reconsider the district's nomination at the Board's December 2008 meeting. At the end of the month, in September 2008, the attorney for some of the property owners sent a letter to Marty Perry, the Kentucky SHPO's National Register Coordinator. The attorney demanded that the nomination process cease and enclosed numerous objection letters from property owners, which he argued constituted over 50% of the owners in the district. The letter explained that there were 157 properties within the district and that he had submitted a total of 129 objections relating to 95 of those properties. At the end of the letter, the attorney questioned the "integrity of th[e] process" because one property owner, Harold Black, informed him that Mr. Perry had told Black that "he would be wasting his time to object . . . because . . . there would never be objections obtained to amount to over 50%." Mr. Black's objection letter was nevertheless submitted in the September letter and included in the Keeper's final count.

The SHPO responded by letter one month later. It told the objecting property owners that it would note their objections (even if it were a majority) but that it must nevertheless submit the nomination to the Keeper.

***State Court Litigation***. The letter prompted six property owners, including some of those involved here, to file a lawsuit in Kentucky state court against the SHPO, the Commission, and

individual state employees in their personal capacities. The property owners sought, among other things, to enjoin the nomination process of the district. No federal agency or federal official was involved in that litigation. The Kentucky trial court granted the property owners a temporary restraining order, which prevented the State Review Board from considering the district's nomination at the Board's December 2008 meeting. The injunction was later lifted, and the nomination process continued.

***Continued Nomination***. With another Board meeting approaching in May 2009, the SHPO mailed, for the third time, written notices to the property owners in the district. The SHPO also held a second public meeting in April 2009. The Board ultimately approved the nomination at its May 2009 meeting.

Contemporaneously, from August 2008 until October 2009, the objection count fluctuated as new objections were submitted and others were either withdrawn by the owner or disallowed by the SHPO. During this time, the list of property owners also changed slightly, some owners submitted letters supporting the nomination, and the SHPO's office often contacted the National Register's office for guidance regarding the regulations.

In early June 2009, the SHPO submitted the district's nomination to the Keeper. The nomination letter certified that a majority of owners had not objected, calculating only 91 objections out of 182 property owners.[3] It noted that there were a "significant number" of objections and that they had been "complicated" because many were submitted by the same owners (who owned more than one property). It also noted that there were 103 claimed objections but that nine were disallowed and three were withdrawn. The SHPO included a list of all the objections received so that the Keeper could verify its calculations.

---

[3] The objection count was exactly 50%, just short of the required majority.

But the Keeper's review of the nomination was cut short. The Kentucky trial court ordered the SHPO to request that the nomination be returned. The SHPO complied, and the Keeper returned the nomination.

***Renomination and Listing***. In early August 2009, the SHPO sent a letter to the property owners. In the letter, the SHPO informed the owners that the Keeper had returned the nomination and that two additional property owners had withdrawn their objections. The SHPO gave the property owners ten days to submit objections before the SHPO would resubmit the nomination to the Keeper. After ten days had passed, the SHPO sent another letter to the property owners, relaying its updated calculations. The SHPO calculated 84 objections out of 184 property owners.[4] There were still 103 claimed objections, but nine were disallowed and ten were withdrawn. Later, four more objections were presented at a Kentucky trial court hearing, bringing the total to 88 objections out of 184 property owners.

In September 2009, after more objections were presented, the SHPO resubmitted the nomination to the Keeper. The submission certified that there were 90 valid objections out of 184 property owners. The Keeper informed the objecting property owners of the nomination and provided them a copy. The property owners then requested an extension of the public comment period, and the Keeper extended the period an additional month, until late November 2009. During this time, the property owners continued to submit objections to the Keeper via email. The owners also sent the Keeper a copy of an order from the ongoing Kentucky state court litigation.

---

[4] Two new property owners were included in this calculation.

In the end, the Keeper listed the district on November 27, 2009. It found that the district was eligible under NHPA criteria and that a majority of property owners had not objected to the listing. Only 90 of 182 owners objected.[5]

***Continued State Court Litigation***. Weeks before the district was listed in the National Register, the Kentucky trial court dismissed the state court litigation for lack of jurisdiction. After its dismissal, the court expressed that it had a "due process concern" with the way the regulations counted objections. Specifically, the court was concerned that the federal regulations might "depriv[e] landowners of property rights 'to be left alone' and 'the right not to have your property designated as something that you object to under the process.'" The court also believed that the objection process was "arbitrary and unclear." But the court noted that there was "no error with the administration of the regulation by the [SHPO]."

Years later, in 2013, the Kentucky court of appeals reversed the trial court's dismissal but agreed with the court's due process concerns:

> We agree with the trial court that the process used by [the SHPO] to assess the number of property owners and the corresponding number of objections is fundamentally flawed. It is arbitrary and unclear because there is no fixed time at which the number and names of the landowners are determined at a reasonable time prior to the hearing, thus leading to a continual fluctuation in the number of landowners and required objections.
>
> Additionally, [the SHPO] ha[s] failed to provide any citation to any regulations that enumerate that trusts, estates, LLCs, and LPs are only entitled to a single vote while, in contrast, a husband and wife each have a vote regardless of how the title is held. We believe that without these written guidelines, the [SHPO]'s discussion with the [Keeper] as to how to treat the votes disallowed is fundamentally arbitrary and in violation of [property owners'] due process rights because the statute, as written, does not provide a meaningful right to be heard.

---

[5] Although the listing letter certifies that there were 182 property owners, it is unclear if that is the official count. The total number of owners appears to have increased to 183 after the Keeper consulted with the SHPO after the district was listed, but then the number fell back down to 182 in the Keeper's denial of the owners' delisting petition and then went back up to 183 in the Keeper's appellate brief. Either way, the number of objections would not have constituted a majority.

9

Similarly to the trial court, the state court of appeals held that the SHPO "did not misapply the administration of the regulations." On remand, the trial court found a due process violation for the reasons stated by the court of appeals.

*Delisting Petition*. Reinvigorated by the trial court's decision—nearly seven years after the district had been listed—several property owners petitioned the Keeper to remove the district from the National Register. They filed the petition pursuant to C.F.R. § 60.15(a)(4), alleging a "[p]rejudicial procedural error in the nomination or listing process." For support, they relied heavily on the alleged due-process violations raised by the Kentucky state courts. Many property owners in the district, however, sent letters opposing the removal petition. In March 2017, the Keeper found no evidence of procedural error in the nomination or listing process and rejected the removal petition.

*Federal Court*. Some of the objecting property owners (the "owners") then brought this federal lawsuit against the Keeper, the Secretary of the Interior, the U.S. Department of the Interior, and the National Park Service (collectively, the "Keeper"). The owners allege that the Keeper wrongfully denied their removal petition and violated their constitutional due process rights. They asked the court to compel the Keeper to delist the district and to declare the district ineligible for future listing; they asked as well for unspecified damages.[6]

After the Keeper filed the administrative record in the district court, the owners requested leave to supplement it and to take limited discovery, alleging that certain documents were omitted from the record. The district court denied both requests. The parties then filed cross-motions for summary judgment, and the district court denied the owners' motion and granted the Keeper's

---

[6] On appeal, the owners also ask the court to "restrain [the Keeper] from attempting to re-list or re-nominate the property."

motion. Relevant here, the district court found that the owners had Article III standing to bring their claims but that the claims failed because the Keeper's denial of the removal petition (1) was neither arbitrary nor capricious under the Administrative Procedure Act, and (2) did not violate the owners' constitutional due-process rights. The owners appeal.

## II.

We review under the Administrative Procedure Act a final agency action, and we review de novo a district court's decision to uphold that action on summary judgment. *Hosseini v. Nielsen*, 911 F.3d 366, 371 (6th Cir. 2018). The APA provides a "narrow" standard of review, under which we will uphold the Keeper's decision unless we find the decision to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quotation omitted). But before we undertake this analysis, we must first ensure that the district court had jurisdiction to entertain the suit. *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

## III.

The owners seek review of the Keeper's denial of their delisting petition, arguing that the district court erred because the Keeper's decision was arbitrary and capricious and violated their constitutional due-process rights. In the owners' view, the Keeper's denial was arbitrary and capricious because it failed to adequately review and respond to the owners' procedural-irregularity allegations, and because the regulations relied upon by the Keeper conflict with the NHPA. Moreover, the owners argue, the Keeper's denial violated their due-process rights for the same reasons recognized by the Kentucky state courts. The Keeper responds that the owners do not have standing, that their claims amount to a time-barred challenge to the regulations, and that the Keeper's decision was rational and did not violate due process.

The merits of this case leave plenty up for debate. But, contrary to the district court's conclusion, we must leave those questions for another day. Article III of the Constitution limits our judicial "Power" to resolve disputes to "Cases" and "Controversies." U.S. Const., art. III, § 2. And one "telltale" of a case or controversy is that "the parties have standing to bring it." *Hagy v. Demers & Adams*, 882 F.3d 616, 620 (6th Cir. 2018).

The doctrine of standing has three components: the plaintiff (1) must have suffered an injury in fact (2) that is fairly traceable to the defendant's actions and (3) that is likely to be redressed by a favorable decision of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The plaintiff bears the burden of establishing standing and must do so "for each claim he seeks to press" and "for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (quotation omitted); *see Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 406 (6th Cir. 2019). That burden is a threshold one. Once met, it simply opens the courthouse doors to a plaintiff. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

But it is not inconsequential. Animated by separation-of-powers concerns, standing cannot be "dispensed in gross," *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quotation omitted), and its elements are more than "mere pleading requirements," *Lujan*, 504 U.S. at 561. Significant here, the proof required to establish standing increases at each successive stage of litigation. *Id.* ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof . . . ."); *see TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021); *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014). Thus, at the summary judgment stage, a plaintiff must "present specific facts supporting standing through citations to the administrative record or 'affidavits or other evidence' attached to its opening brief, unless standing is self-evident." *Tenn. Republican Party v. Sec. & Exch. Comm'n*,

863 F.3d 507, 517 (6th Cir. 2017) (quotation omitted); *see Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 462 (6th Cir. 2019); Fed. R. Civ. P. 56(c). The owners do not carry their burden.

***Wrongful-denial claim***. The owners' first claim is that the Keeper's denial of their delisting petition was arbitrary and capricious. In response, the Keeper contests the first element of standing: injury in fact. The Keeper says the owners fail to identify any harm, supported by affidavit or other evidence, resulting from the district's continued listing in the National Register. We agree with the Keeper. Because the NHPA places an obligation only on federal agencies, and not on the owners of listed properties, the listing of the district does not in itself injure the owners.

An Article III injury requires the "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). For an injury to be "particularized," it must be personal to the plaintiff, not generalized in a way that equally affects everyone else. *Spokeo*, 578 U.S. at 339; *see Lance v. Coffman*, 549 U.S. 437, 439–40 (2007) (per curiam). For it to be "concrete," it must be "'real' and not 'abstract'"—which means that "it must actually exist." *Spokeo*, 578 U.S. at 340. Often, these will be physical or monetary harms. *TransUnion*, 141 S. Ct. at 2204. But an intangible injury, too, such as a violation of free-speech or free-exercise rights under the First Amendment, generally suffices so long as it is the type of injury traditionally redressed by American courts. *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 861 (6th Cir. 2020); *Spokeo*, 578 U.S. at 340–41. The standard for an injury is one of kind and not degree, as even an "identifiable trifle" will suffice. *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 689 n.14 (1973); *see Craftwood II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 481 (7th Cir. 2019); *Hallums v. Infinity Ins. Co.*, 945 F.3d 1144, 1147 (11th Cir. 2019).

The NHPA requires that, "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, [a federal agency] shall take into account the effect of the undertaking on any historic property" in the National Register. 54 U.S.C. § 306108; *see id.* § 300308. That directive plainly limits the conduct only of federal agencies. *Kaufmann v. Fed. Aviation Admin.*, 722 F. App'x 438, 442 (6th Cir. 2018). But if there were any confusion, the NHPA's accompanying regulations explain: "Listing of private property on the National Register does not prohibit under Federal law or regulation any actions which may otherwise be taken by the property owner with respect to the property." 36 C.F.R. § 60.2. Therefore, the listing of private property in the National Register does not, without evidence to the contrary, restrict an owner's use or enjoyment of his or her property. To be sure, it does incentivize owners to preserve their properties. For example, an owner of a listed property becomes eligible for certain federal grants and favorable tax treatment for qualifying rehabilitation and preservation work done on the property. *See* 36 C.F.R. § 60.2(b)–(c); *see* 26 U.S.C. § 47. But the NHPA does not *require* owners to preserve their listed properties. A congressional "carrot" is different from a "stick." *See F.P. Dev., LLC v. Charter Twp. of Canton, Michigan*, 16 F.4th 198, 201 (6th Cir. 2021) (distinguishing "carrot" measures from "stick" ones).

Because having their properties listed in the National Register does not impose any obligations, restrictions, or consequences on the owners, they have not suffered any particularized or concrete injury. *Moody Hill Farms Ltd. P'ship v. United States Dep't of Interior*, 205 F.3d 554, 562 (2d Cir. 1999) (finding that a listing on the National Register "on its own does not impose any burdens on plaintiffs' use of their property");[7] *see Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir.

___

[7] *Moody Hill* did not consider standing. There, the Second Circuit dismissed the property owners' due process claim on the merits because it found that the owners were not deprived of a protected property interest when their properties were listed in the National Register. *Moody Hill*, 205 F.3d at 561–62.

2022) (finding a high likelihood of no injury because the challenged action did "not regulate the [plaintiffs] by telling them what they can or cannot do in their jurisdictions"); *Huff*, 923 F.3d at 463 (finding no injury where the challenged conduct "did not 'have any effect on [the plaintiff] whatsoever'"); *see also California v. Texas*, 141 S. Ct. 2104, 2121 (2021) (Thomas, J., concurring) (agreeing with the majority's finding that the plaintiffs lacked standing because their "only [alleged] harm [was] caused by the bare existence of an unlawful statute that d[id] not impose any obligations or consequences" on them).

As best we can tell, the only "harm" alleged by the owners is that they do not want their properties listed in the National Register. Beyond that, the owners do not explain—let alone provide evidentiary support for—exactly *how* that harms them. It is incumbent on the owners to make that showing at this stage in litigation. *See Sault Ste. Marie Tribe of Chippewa Indians v. United States*, 288 F.3d 910, 915–16, 16 n.6 (6th Cir. 2002) (finding no injury due to the lack of "specific facts" at the summary judgment stage); *Fair Elections Ohio*, 770 F.3d at 459–60 (same); *Sierra Club v. U.S. E.P.A.*, 793 F.3d 656, 662 (6th Cir. 2015) ("We . . . see no reason why a petitioner should not be able to establish, by affidavit or other evidence, specific facts supporting each element of standing."). The district has now been listed in the National Register for nearly thirteen years. The owners have had more than enough time to gather evidence to support their asserted injury.

It is true that property owners bringing claims relating to their real properties often have no difficulty establishing standing. But often is not always. In an ordinary property case, the alleged injury, for example, flows directly from a trespass, *CHKRS, LLC v. City of Dublin*, 984

---

Nevertheless, *Moody Hill* supports the proposition that the NHPA has no effect on an owner's property interests and "constrains only the . . . departments of the federal government." *Id.* at 562; *see id.* at 558.

F.3d 483, 489 (6th Cir. 2021), a per se governmental taking of property without compensation, *Horne v. Dep't of Agric.*, 569 U.S. 513, 526 n.6 (2013), or even from a locality's zoning decision relating to a neighboring property, *Brooks v. Butler Cnty., Ohio*, No. 21-4129, 2022 WL 2526601, at *5 (6th Cir. July 7, 2022). That is not the case here. The owners claim no actual present-day harm whatsoever—whether it be physical, economic, or intangible. Absent this, we cannot assume that these owners have suffered a concrete injury. *See Tenn. Republican Party*, 863 F.3d at 517; *Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990) ("A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing.").

The district court held that the owners alleged a cognizable injury because the listing of the district may have future consequences. As the owners describe it, the listing burdens the "future development" of their properties and "invokes a level of government oversight o[n] projects affecting the [owners]' properties that is not imposed on unlisted properties."

It is certainly possible that a listing in the National Register could, in the future, materially impair a property owner's rights. One example recognized by the district court was that, "[s]hould the property owner wish to destroy an historic structure on his or her listed property," the owner might no longer receive certain tax incentives. Another was that, "[s]hould the property owner desire a surface coal mining permit," the owner must "risk being denied a permit." *Id.* (emphasis added); *see* 36 C.F.R. § 60.2(d). At oral arguments, the owners presented a third example: *should* the federal government decide to build an interchange over their properties, the owners would likely lose out on an opportunity to contract with the government because their properties must be considered for preservation.

But unsupported shoulda-coulda-woulda allegations are not enough. To constitute an injury in fact, the threatened injury must be more than possible—it must be "*certainly impending*."

16

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotations omitted); *see Buchholz*, 946 F.3d at 865. The owners do not present any evidence (or any argument, for that matter) that they had concrete plans to use their properties in ways that have now been thwarted by the listing. They do not, for example, state that they have been hindered from demolishing their properties, seeking coal-mining permits, contracting with the federal government, or selling their property interests to third parties.[8] Moreover, a generalized grievance based on the heavy hand of the government is not a cognizable injury. *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013) ("[A] 'generalized grievance,' no matter how sincere, is insufficient to confer standing."); *see Glennborough Homeowners Ass'n v. United States Postal Serv.*, 21 F.4th 410, 415 (6th Cir. 2021) (mental displeasure with government action "falls well short of a concrete harm needed to establish Article III standing"); *Ass'n of Am. Physicians & Surgeons v. United States Food & Drug Admin.*, 13 F.4th 531, 537 (6th Cir. 2021) ("disagreement" with government action "is not an injury, no matter how 'sharp and acrimonious' it may be" (quotation omitted)).

Therefore, the owners' unsupported "some day" allegation of possible injuries—that have yet to come to pass—is not enough to establish standing. *Lujan*, 504 U.S. at 564; *Clapper*, 568 U.S. at 409; *see Huff*, 923 F.3d at 463 ("The inescapable truth is that [the plaintiff] has not suffered [his claimed future injury] in the five years since he requested his file from TeleCheck."); *cf. Sierra Club v. Jewell*, 764 F.3d 1, 5–8 (D.C. Cir. 2014) (holding that a preservation group, with an aesthetic interest in observing the historic property at issue, had standing to challenge the removal

---

[8] At one point, the owners argue that their injury "has nothing to do with future coal mining permits or tax credits"—and everything to do with the procedural injury that "has *already* occurred." This argument, however, conflates the owners' wrongful-denial claim with their due process claim. The district court did the same. It is true that standing is somewhat relaxed for procedural due-process claims. *Lujan*, 504 U.S. at 572 n.7; *Parsons v. U.S. Dept. of Justice*, 801 F.3d 701, 712 (6th Cir. 2015) ("Claims for violations of procedural rights are treated uniquely under the standing inquiry."). But we must separately analyze each of the owners' claims when assessing standing. *Kanuszewski*, 927 F.3d at 406.

of the property from the National Register because, if the property remained unlisted, surface coal mining was expected to begin on the property). Because the owners' wrongful-denial claim is divorced from any concrete harm, they lack standing to bring it.[9]

***Due Process Claim***. Neither can the owners establish subject-matter jurisdiction over their second claim, that the Keeper's decision violated their constitutional due-process rights. This is the rare instance where a court lacks jurisdiction because a claim is so undeveloped and devoid of merit that it does not involve a federal controversy. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

The Due Process Clause of the Fifth Amendment protects individuals from the deprivation "of life, liberty, or property, without due process of law." U.S. Const. amend. V. To establish a procedural due-process claim, a party must show: "(1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process." *Fields v. Henry Cnty., Tenn.*, 701 F.3d 180, 185 (6th Cir. 2012).

In very limited circumstances, a claim that is "wholly insubstantial and frivolous" on the merits leaves the court without jurisdiction to entertain it. *CHKRS*, 984 F.3d at 489 (quotation omitted); *see Benalcazar v. Genoa Twp., Ohio*, 1 F.4th 421, 424 (6th Cir. 2021). The claim must

---

[9] There is also good reason to question redressability—*i.e.*, whether our delisting the district would meaningfully redress the owners' alleged injuries. *Parsons*, 801 F.3d at 715 ("An injury is redressable if a court order can provide 'substantial and meaningful relief.'") (quoting *Larson v. Valente*, 456 U.S. 228, 243 (1982)). The owners want their properties delisted because of the federal oversight that follows a listing. But when a property is delisted from the National Register, it automatically remains "eligible" to be relisted and, as such, must be treated as a "historic property" (just as a listed property would) and considered for protection from destruction by federal agencies. 36 C.F.R. § 60.15(a)(4) (property removed from the National Register based on procedural error is "automatically . . . considered eligible for inclusion in the National Register"); 54 U.S.C. § 306108 (Federal agencies "shall take into account the effect of the undertaking on any historic property"); *id.* § 300308 ("historic property" means any "district, site, building, structure, or object included on, or *eligible for inclusion* on, the National Register" (emphasis added)). Thus, delisting the district would likely do no good. The owners appear to agree, stating in their reply brief that "[w]ithout [an] injunction" declaring the district ineligible for future listing and prohibiting its renomination, "any ruling . . . in [their] favor . . . would be meaningless."

be "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co.*, 523 U.S. at 89 (quotation omitted); *see Shapiro v. McManus*, 577 U.S. 39, 45–46 (2015). That is the case here.

As the district court found, the owners' due process claim is "wholly undeveloped." On appeal, the owners provide scant explanation for their claim and cite no relevant authority to support it. They do not outline the general elements of a due-process violation, nor do they describe what protected property interest is at issue, how exactly they are deprived of it, or what process would have been adequate. They did the same thing before the district court. And their complaint is equally sparse as it relates to the due-process claim, devoting only a single, fairly conclusory sentence to it. Even though the owners refer in their brief to the Kentucky court-of-appeals decision (that found the regulations to be "fundamentally flawed"), they do so summarily and without providing any explanation or analysis of their own. The owners cannot piggyback the state court's decision in this way. What is more, as the district court recognized, the Kentucky court of appeals "did not explain whether it believed that the regulations violated procedural or substantive due process requirements, or both, or whether its analysis rested on the state or federal constitution, or both."

Thus, even assuming the owners have not forfeited their due-process claim by "advert[ing] to [it] in a perfunctory manner" on appeal, *Harden v. Hillman*, 993 F.3d 465, 477 n.3 (6th Cir. 2021) (quotation omitted), their claim is totally frivolous such that it deprived the district court of subject-matter jurisdiction to decide it, *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999); *Hassink v. Mottl*, 47 F. App'x 753, 754–55 (6th Cir. 2002); *Burnham v. Friedland*, No. 21-3888, 2022 WL 3046966, at *2 (6th Cir. Aug. 2, 2022).

**IV.**

Because the owners fail to establish subject-matter jurisdiction, we do not reach the merits of their claims. We also have no need to consider whether the district court erred in declining to supplement the administrative record, as none of the owners' requested documents would have cured the jurisdictional defects. We therefore **VACATE** the judgment of the district court, and **REMAND** with instructions to dismiss for want of jurisdiction.